## William L. Sackett et al., Appellants, v. City of Morris et al., Appellees.

### Gen. No. 5,119.

1. CITIES, VILLAGES AND TOWNS—*power of city council to compromise litigation.* It is peculiarly within the province and power of the city council of a city to compromise litigation which affects the business affairs of the city.

2. CITIES, VILLAGES AND TOWNS—*power and duties of city attorney.* It is the duty of a city attorney to obey the orders of the city council with respect to litigation which affects the business affairs of the city and he has no power with respect to such litigation superior to such city council.

3. CITIES, VILLAGES AND TOWNS—*when resolution deemed carried.* The declaration of the mayor that a resolution presented to a city council is lost, is not conclusive; such a resolution will be deemed to have carried if the records of the meeting of such council show facts from which such legal conclusion, namely, that the resolution carried, may be drawn.

4. CITIES, VILLAGES AND TOWNS—*what resolutions pertaining to water meters adopted and valid.* *Held,* that the resolutions in question in this case were not designed to repeal an ordinance, that the same were lawfully adopted and were valid. Such resolutions provided in substance, first, that certain kinds of meters could be installed by consumers of water; second, that such meters need not be purchased from the city but could be purchased direct by such consumers, and, third, that until such time as said meters were installed (a time limit being fixed by the resolution) the previous prevailing flat rate for the use of water would be charged.

5. INJUNCTIONS—*when damages upon dissolution should not be allowed.* If an injunction is obtained against a city and subsequently dissolved and the bill dismissed at the instance of the complainant, damages should not be awarded if such dissolution

and dismissal were the result of a settlement made pursuant to negotiations regularly initiated by the city council with such complainant and finally concluded by a settlement made in writing with a majority of such city council, competent to pass the resolution of settlement provided for, which said resolution of settlement was subsequently duly passed.

6. INJUNCTIONS—*when city officials not entitled to damages upon dissolution.* City officials made defendants in their official capacities are not entitled to an allowance of damages upon dissolution if such city is not entitled to damages.

Bill in equity. Appeal from the Circuit Court of Peoria county; the Hon. L. D. PUTERBAUGH, Judge, presiding. Heard in this court at the October term, 1908. Reversed. Opinion filed June 10, 1909.

C. F. HANSON for appellants.

J. W. RAUSCH, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

William L. Sackett and twenty-two others, residents and taxpayers of the city of Morris, filed a bill in equity in the Grundy Circuit Court against the city of Morris and its mayor and superintendent of waterworks, and obtained an injunction restraining the defendants from enforcing certain ordinances concerning water meters, and from shutting off water from complainants and others similarly situated, and from engaging in the business of buying and selling water meters. The cause was removed to the Circuit Court of Peoria county, where, on motion of the defendants, the complainants were ruled to file an injunction bond in the penal sum of $1,500 by a certain day, and a motion to dissolve the injunction was continued till 10 o'clock A. M. of the same day. On that day complainants dismissed the bill without prejudice. The defendants filed a suggestion of damages by reason of the wrongful suing out of said injunction, the several items of the suggestion amounting to $1,836.13. Thereafter they filed a bill of particulars, amounting to $2,857.65. There was a hearing upon said suggestion of damages

and a decree against complainants for $387.15, from which complainants appeal. Defendants did not appeal from the disallowance of the major part of their claim, nor have they assigned cross errors. Besides other objections to the allowance of damages, it is claimed by complainants that the bill was dismissed as the result of a settlement and compromise between the complainants and the city council, and that therefore the complainants are not liable in damages to the defendants; and also that nearly all of the expenses for which allowance was made were incurred by the city attorney in violation of the direction of the city council in a matter within its control.

The city of Morris has operated a public waterworks plant since 1894, and supplies many citizens with water for domestic and other uses. It charged what is known as "flat rates" for the water. On July 8, 1907, the city adopted an ordinance abolishing its tariff of rates and requiring all water consumers to use a meter to be thereafter approved by the city, and to pay meter rates. It provided that the city of Morris should within thirty days decide upon a proper meter and that all water consumers must furnish one of said meters on or before October 1, 1907. On August 12, 1907, the city, by another ordinance, adopted certain styles of water meters, and provided that they should be purchased by the city and sold to the consumers at cost. The bill assails the validity of these ordinances for various reasons, charging, among other things, that the practical operation of these ordinances would be to give one particular manufacturer a monopoly of the sale of water meters to be used in Morris; that other styles of water meters manufactured by other concerns were better and could be purchased at a lower cost; that the city council had no authority of law to enter into the business of buying and selling water meters; and that if it had that power, its annual appropriation bill covering that period did not contain any appropriation of money to be used in buying water

meters, and that it had no funds which it could lawfully use for that purpose. The filing upon the bill does not appear in the record, and witnesses for defendants testified that it was filed on December 4, 1907, but the record shows that it was sworn to on January 3, 1908, and the summons and injunction were issued on January 4, 1908, so that this suit seems to have been commenced on January 4, 1908. Another bill had been filed by one Eldred about December 4, 1907, and an injunction had been issued thereunder enjoining the enforcement of said ordinances as against Eldred. There was also another case pending affecting the validity of these ordinances, known in this record as the Bridge case. The Eldred case and the Bridge case were pending on December 23, 1907, when, at a meeting of the city council, a motion was adopted that the mayor appoint three members of the city council to act with the city attorney "in hiring an assistant attorney to help defend the injunction suits that have been brought against the city," the mayor to be a member of the committee. Three aldermen were appointed upon the committee. This resolution by its terms only related to injunction suits then pending, and the record seems to show that this suit was not begun until later. It was a disputed question of fact whether the aldermen of this committee who constituted the majority thereof were ever called together or held a meeting or took any action. The allowance here appealed from was chiefly for the fees of other attorneys in Morris and in Peoria hired by the city attorney in this case without any authority from the city council save the above resolution.

On January 18, 1908, defendants entered a motion in vacation before a judge of the Circuit Court to dissolve the injunction. The judge continued the hearing of the motion to the March term. Thereupon the defendants filed a petition for a change of venue, alleging the prejudice against the defendants of all of the judges of that circuit, and, on January 25, that motion

was granted, and the parties then agreed that the venue should be changed to the Circuit Court of Peoria county. Thereafter, and before a transcript for the transfer of the record of said cause had been completed, the city council held a meeting on January 27. The city of Morris contains four wards, and a full council consists of the mayor and eight aldermen. Under the general act for the incorporation of cities a majority of the aldermen elect constitute a quorum to do business, and a majority of a quorum present can transact all ordinary business, but the concurrence of a majority of all the members elected is necessary to the passing of any proposition or any ordinance involving the expenditure or appropriation of money. At that meeting a resolution in regard to the pending water meter injunction suits against the city of Morris was presented and declared out of order by the mayor. An appeal was taken from this decision. There were six aldermen present and the appeal was sustained by a vote of four to two. The resolution was then changed so as to contain a direction to the superintendent of waterworks to take no further action to install water meters or shut off water from any consumer till further instructions from the city council and to instruct the fire and water committee to consult with the parties to the injunction suits and see if negotiations could not be entered upon for the settlement of the differences between the water consumers and the city that expense might be saved and harmony among the people restored; and that the committee should report at an adjourned meeting on February 1. The records of the city council do not show that this motion was adopted and an effort to prove by the city clerk that it was in fact adopted was objected to and the objection sustained. On February 1 the adjourned meeting was held. At that meeting the fire and water committee reported that progress had been made in negotiating a settlement of the meter suits pending against the city and that a settlement had been partly arranged;

that the committee had been able to see only a part of the complainants in those cases, but that assurance had been given that all would join in so adjusting the matter with the city as not to interfere with putting in meters. The committee asked that their time to act be extended till the next regular meeting, and they recommended that the city attorney do nothing in connection with these cases in court till the further report of the committee and instruction by the city council. The record of this meeting shows that, at the request of the mayor, the city attorney informed the council that the ordinances hereinafter referred to gave him power to prosecute or defend in behalf of the city all cases in which the interests of the city were involved and empowered him to dismiss any suit on just and equitable terms, and that the city council had no power to act in the matter; that anything the city council might do would be null and void; that any action by the city council to prejudice the interests of the city would be disregarded by him; that if the complainants offered a fair and honest proposition of settlement he would settle with them, but he would not permit the rights of the city to be bartered away; and if he doubted the wisdom of the propositions submitted, he would submit them to the city council before accepting them; and that the members of the city council would lay themselves personally liable if they made a settlement by which the city became liable for one cent. The motion to adopt the report was then voted upon under a call of the yeas and nays. Six aldermen, a quorum, were present. Four voted to adopt the report and two against it. The motion was adopted and the mayor so declared. By the adoption of this report the city attorney was directed to do nothing in connection with these cases till the further report of the committee and instruction by the city council. Thereafter some one, and evidently the city attorney, caused the transcript on change of venue to be completed and the record and files to be transmitted to the Circuit Court of Peoria

county. The city attorney thereafter hired other attorneys, resident in Peoria, to represent the city in this case, and after the cause reached that court he filed an answer, and moved to dissolve the injunction, and moved for and obtained an order for an injunction bond; and these acts were done by the city attorney without any further instructions from the city council.

The general act for the incorporation of cities provides for the election of a city attorney, and does not prescribe his powers or duties. In Agnew v. Brall, 124 Ill. 312, a city attorney had prosecuted a defendant before a justice of the peace for the violation of a city ordinance, and had recovered a judgment in favor of the city for $200. During the time allowed for an appeal defendant petitioned the city council to release the judgment on his payment of $100 and the costs. The city council adopted the offer and directed the release of the judgment upon the payment of that sum, and defendant paid the $100 into the city treasury and paid the costs. The city attorney claimed that the city council had no right to accept a part of a judgment in satisfaction of the whole, and, disregarding the action of the city council, sued out an execution to collect the full amount of the judgment. Defendant filed a bill to enjoin the collection of the execution. It was held that the city council could not give away the property of the corporation without consideration nor discharge the debt of a solvent party without payment, where no controversy exists as to its validity, but that it had power to settle disputed claims and pending suits and to compromise doubtful controversies; and that while the defendant in that case still had a right of appeal, the city council had a right to settle it, for the final result might be adverse to the corporation. The contentions of the city attorney were overruled. In City of Lewiston v. Hummel, 38 Ill. App. 326, after a fine had been assessed against defendant, but before his right to appeal had expired, the city council remitted the fine, but afterwards undertook to enforce it.

It was held that as the claim might have been defeated on appeal it was within the power of the city council to settle it as it thought best, and that it could legally remit the fine. In Flynn v. City of Springfield, 120 Ill. App. 266, the foregoing authorities were not strictly followed; but upon the present subject it was there said: "In suits that concern the city regarded as an individual, the city attorney is required to follow the direction of the city council."

The present suit relates to the management and method of conducting the business affairs of the municipality. The answer of the defendants alleges that the flat rate had proved insufficient to defray the expenses of conducting the waterworks, and that the purpose of requiring the universal use of water meters was to make the waterworks self-sustaining and to prevent waste of water by requiring each consumer to pay for all the water he actually used. It is obvious that these were matters wholly within the control of the city council, and that it could make any honest compromise of any litigation which had arisen concerning these matters; and that the city attorney was in duty bound to obey the directions of the city council in regard to such litigation. But it is argued that because of certain ordinances adopted by the city council of the city of Morris relative to the office of city attorney, that officer became the sole authority in behalf of the city which could settle this suit. These supposed ordinances are set out in appellee's brief, but we do not find them in the record, though the certificate of evidence purports to contain all the evidence offered at the hearing. But if the ordinances are as stated in the brief they relate chiefly to the *duties* of the city attorney, and they do not purport to deprive the city council of its authority to compromise litigation concerning the business affairs of the city, and, if they did, they would be invalid, for the legislature has placed the control of the business affairs of the city in the city council, and the city council cannot deprive

itself of the duty to exercise that control. The only authority of this kind which these ordinances purport to confer upon the city attorney is that where he becomes satisfied that a complaint of the violation of any ordinance has been instituted maliciously or vexatiously, and without probable cause, he is authorized to discontinue such proceeding upon just and equitable terms. That provision does not apply to this case, and even it does not deprive the city council of power to control the proceeding. We are satisfied that the city council had ample power to make any honest settlement of this controversy with the consumers of water, and that the city attorney had no authority to interfere with the complete control of the matter by the city council.

Subsequent proceedings by the city council assume that on January 27 the fire and water committee was directed to endeavor to obtain a settlement. For example, the proceedings of the meeting of March 16 contain the following: "The mayor then requested that the committee on fire and water bring in their report on settlement of the meter injunction suits referred to them January 27, 1908." On February 1, that committee made the report already mentioned. On February 10 the committee, styling themselves the committee to whom had been referred for a settlement the pending meter injunction suits against the city, reported that they had taken legal advice outside of Morris, and had ascertained that the city council of Morris had authority to settle this litigation and that the members would not be personally liable; that they had been halted in their negotiations for a settlement; and that they believed it would be beneficial to have a committee of citizens to act with them in an advisory capacity. They asked the adoption of their report as authority in the committee to continue in charge of the matter of settlement. The report suggested the names of three citizens to act as such advisory committee. The recommendations were concurred in by a

vote of four to one. On March 16 the committee, at
the request of the mayor above mentioned, reported
that the complainants were quite willing to settle if
the people were given the rights people are legally
entitled to when called upon to spend their own
money; that they were not seeking to bankrupt the
waterworks or prevent meters being installed, if that
was considered public policy and a remedy for existing
evils; that they were willing to give the city the right
to make such tests of service as were necessary for the
city's protection, but that they demanded the right to
spend their own money without coercion or limitation
by the city or the creation by the city of a monopoly
in the interests of any particular company, by which
the price is made greater than the meters can be
bought for. The committee stated that they presented
an ordinance which they had prepared which provided
for the installation of water meters but did not restrict
the consumer in his purchase. The report stated that
this was the unanimous action of the committee of
the city council and of the committee of the citizens;
that both committees believed it fair to the consumers
and that it gave adequate protection to the city; that
when the ordinance was passed and took effect the
complainants securing the injunction would dismiss
and pay the costs accruing to them, the city to pay its
own costs, and that the committee had found from the
records that the costs of the city would be seventy-five
cents up to the time when the city attorney was in-
structed by the council to take no further action in
the pending suits till the council could act, and that
if there were any costs incurred later by the city attor-
ney, they would be a small item compared to the benefit
to the city. The committee stated in their report that
they introduced the ordinance for the purpose of set-
tling the litigation and securing the dismissal of the
injunction suits. A motion was made that the recom-
mendations of the committee be concurred in. The
mayor declared the motion out of order. An appeal

was sustained by a vote of four to two, there being six aldermen present. A vote by yeas and nays was then taken on the motion to concur in the recommendations of the committee. Four voted for and two against the motion. The mayor declared it lost. This was followed by a motion to read the ordinance, and it was read. The record of the council proceedings shows that there was then a motion that it be read the first time by its title. A title was added to the ordinance and it was read by its title. There was then a roll call, but the record does not disclose what was voted upon. There were four yeas and two nays, and the mayor declared the motion lost. If this was a motion to adopt the ordinance, the ruling was correct. The ordinance itself is not in the record. These votes, however, show that a majority of those attending that meeting, and a majority of a quorum, were in favor of a settlement with complainants, and that the committee and the complainants had reached a basis of settlement if the council would approve it. So far as appears, the settlement did not involve the creation of any liability against the city. It did not involve the abandonment of any right claimed by the city except the right to compel consumers to buy certain specified kinds of meters and to buy them from the city.

Up to this time all the proceedings indicated that it was the view of the city council that the bill of complaint in this case correctly interpreted the ordinance of August 12, 1907, as compelling consumers of water to purchase their meters from the city. But on March 10 the city attorney filed the answer of the defendants in this case, and that answer alleged that the ordinance of August 12, 1907, did not prohibit the installation of an approved meter purchased from any source whatever, whether of the city or not, and that the object of the provision on that subject in that ordinance was only to prohibit the city from charging more than cost to any one who bought a meter from

it. This was an apparent abandonment of one of the chief causes of the contention between the complainants and the city. The defendants, by the city attorney and the other attorneys hired by him, then entered a motion to dissolve the injunction upon the bill, answer and affidavits; the complainants, by a solicitor specially engaged for that purpose, entered a motion to continue the motion to dissolve till a later date when the solicitor of record for complainants could be present; and the defendants entered a cross motion for an injunction bond; and the court continued said motion to dissolve to March 23 at 10 o'clock A. M. and required complainants to file an injunction bond in the penal sum of $1,500 on or before March 23.

The next council meeting after that adjourned meeting of March 16 was to be held on March 23 at 7:30 P. M., which would be after the hour fixed by the court for hearing the motion to dissolve. Unless a special meeting was called there would therefore be no further opportunity for the city council to act till after the court had heard the motion to dissolve. In taking a transcript of the record, filing it in the Circuit Court of Peoria county, hiring additional counsel in Peoria county, filing the answer and moving to dissolve the injunction, and thus actively continuing the litigation while negotiations for a settlement were being carried on between the city council and the complainants, the city attorney had disregarded the directions of the city council given him on February 1 to do nothing further with these cases in court till report by the committee and instruction by the city council. This was a disobedience of the directions of the city council in a matter over which the city council had complete control, and in which it was the duty of the city attorney to execute the directions of the city council. In this condition of affairs, the time for active hostilities in court forced by the city attorney, in disobedience of the directions of his superior, being just at hand, and no council meeting intervening, five members of the city coun-

cil, being the entire fire and water committee which had the matter of settling this litigation in charge and two others, constituting a majority of the entire council and able therefore to pass whatever ordinance or order might be necessary, entered into a written agreement with the complainants.

The five aldermen agreed that at the next meeting of the city council they would introduce and pass the following resolution:

"Whereas, it has been ascertained that there are many other standard water meters in use in various cities of the United States, some of which are much less in price than any now approved by the city council, and Whereas, it is the desire of the city council that water consumers be given all opportunity to get any class of meter they may wish to install; therefore be it resolved, that the city council hereby approves for use in the city of Morris, in addition to other meters heretofore approved, the Buffalo meter, the Niagara meter and Worthington disc meter. Resolved, that the time for installing meters in Morris is hereby extended to August 1, 1908, and that the superintendent of waterworks is hereby instructed to collect water rentals on old flat rates to that period. Resolved, that water consumers shall have the privilege of buying water meters of dealers or manufacturers direct, if they prefer."

This was signed by the five aldermen. Underneath this was the following, signed by two of the complainants and by the solicitor for all the complainants:

"Whereupon the complainants in a certain injunction proceeding now pending against the city of Morris, by the undersigned, one of the complainants, as well as one of the attorneys for the complainants, hereby agree that the above embodies all they have contended for on behalf of the people, to wit, a reasonable length of time in which to install meters and the privilege of buying any standard meter in use in other cities, when the same could be bought for less money than meters heretofore offered by the city and approved by the council, and on behalf of the complain-

ants we hereby agree to dismiss all pending proceedings against the city wherein injunctions have been granted.''

Thereafter, on March 23, and presumably before or at the hour of 10 A. M., on motion of complainants, the injunction was dissolved and the suit was dismissed without prejudice, costs paid. This was in strict compliance with the agreement which the complainants had made with the majority of the entire body of aldermen of the city. Thereafter the city attorney, without any authority from the city council to take that or any further action in the cause, so far as this record discloses, filed the suggestion of damages and procured the allowance here complained of.

Where a statute or a bond provides for an allowance of damages for the wrongful suing out of an injunction, if it shall be dissolved, this means a dissolution by order of court, or upon the failure of complainant to prosecute his suit. We held in Cassem v. Ernst, 84 Ill. App. 70, that it did not include a dissolution by agreement of complainant and defendant upon a settlement of all or a part of the controversies involved in the suit. It is true that in Cummings v. Mugge, 94 Ill. 186, Landis v. Wolf, 206 Ill. 392, and Brown v. Peterson, 117 Ill. App. 401, it was said that the dissolution of the injunction and dismissal of the bill were conclusive that the injunction was wrongfully sued out, but there the injunctions had been dissolved on the motions of the defendants. In Railway Co. v. Burke, 54 Ohio St. 98, it was held that to make complainant liable to such damages there must be a judicial determination of the merits of the case in favor of the defendant, either in a trial on the merits or on a motion to dissolve the injunction, except where the plaintiff dismisses his action without the consent of the defendant. It was there said that ''any agreement between the parties, subsequent to the allowance of the injunction, by which the action is dismissed and the injunction dissolved, is not sufficient in an action on the

bond, where there has been no judicial determination that the injunction should not have been allowed.'' In Palmer v. Foley, 71 N. Y. 106, it was held that where there had been no judicial determination that the plaintiff was not entitled to the injunction, but it was dissolved by the voluntary and amicable agreement of the parties, there was no liability by the plaintiff for damages. This was approved in Johnson v. Elwood, 82 N. Y. 362. Appellees cite St. J. & E. P. Co. v. Graham, 165 Ind. 16, where it is held that a voluntary dismissal of an injunction suit by plaintiff gives defendant a right to damages, on the ground that by dismissal plaintiff confessed that he had no right to the injunction, and that such dismissal is the same as a judgment to that effect. But the same case also holds that the dismissal of the action by an amicable and voluntary agreement of the parties is not a confession by plaintiff that he has no right to an injunction, and does not operate as a judgment to that effect, and it was there held that the lower court erred in sustaining a demurrer to an answer which set up that the dismissal of the injunction suit was a material element in a settlement had between the parties. The cases above cited comment on other cases illustrative of the rule.

It is argued that this agreement between the five aldermen and the complainants was illegal. This is based, first, on the contention that the sole power of settlement was vested in the city attorney. We have already shown that the position is unsound. Second, it is urged that the city council, even, could not make a donation of the costs to complainants. This was not a donation. The settlement proposed did not require the city to pay any costs made by complainants, but only the costs, if any, made by the city and for which the city became liable when the costs were incurred. But the record does not disclose that the city had made any costs whatever. The costs attending a change of venue are to be paid by the party asking for the

change and are not a part of the costs of the suit.
Hurd's R. S., chap. 146, sec 12.   The city therefore
could never recover from complainants the cost attend-
ing the change of venue.   As section 14 of the statute
relating to fees read prior to July 1, 1907, defendants
were required to pay an appearance fee of $1.   But
that part of the section was repealed by the act of 1907,
amending that section.   Laws of 1907, p. 324.   The
record therefore does not show that the city had in-
curred any costs.   The proposed settlement did not
place any additional charge upon the city.   The ques-
tions whether the ordinances attacked by the bill of
complaint were in excess of the authority of the city
and whether the city could use its general funds with
which to buy a large number of meters when it had
made no appropriation for that purpose, and whether
this ordinance was in fact so worded as to create a mo-
nopoly in favor of a particular manufacturer of water
meters, and whether the true meaning of the ordi-
nance required consumers to buy their meters of the
city, and whether the city had power to compel that,
were matters of serious import, upon some of which,
at least, the city might ultimately be defeated.   There-
fore the city council had a clear right to settle these
matters.   Indeed, when the city council found that a
large number of its citizens felt aggrieved at its ac-
tion, even if the alleged grievances seemed to it unreal,
it had a right to seek a reasonable and satisfactory
settlement of the controversy.   The question whether
a settlement should be effected and what the city
should yield, rested wholly with the city council.   The
mayor is a member of the city council and had the
right to exercise such authority on the subject, and
such only, as the charter vested in him as mayor.   The
city attorney had no duty or authority in the matter
except to protect the interests of the city in litigation
when not directed by the city council, and to obey its
directions when it did direct him.   Third, it is said
that the agreement of March 21 was not made by the

city council, and that five aldermen acting outside of a council meeting could not bind the city unless they had been empowered to do so by a vote of the city council. These positions are sound. Yet it does not follow that complainants or the five aldermen were acting illegally or improperly. They were driven to this step by the action of the city attorney in disregarding the directions of the city council and pressing the litigation and getting the motion to dissolve set to be heard before the next regular council meeting. The resolution was a proper one to be adopted, and when five aldermen agreed to vote for it, it was certain that if they did so the settlement would be effected. Complainants agreed in writing that this was a satisfactory settlement, and agreed that if it was adopted they would dismiss their suit and have the injunction dissolved, and pay the costs. Thereupon, as the motion to dissolve was set for 10 A. M., of March 23, while the council would not meet till 7:30 P. M., of that day, the complainants in reliance upon the stipulation signed by the fire and water committee which had the negotiations in charge and by two other aldermen, making a clear majority of the council, competent to pass an ordinance if one was needed, procured the dissolution of their injunction and the dismissal of their bill, and paid the costs without waiting for the session of the city council that evening. It is clear that the complainants considered that the controversy was settled, and that they dismissed the bill in that belief. We are of opinion that such a dismissal ought not to be considered equivalent to a judgment that the injunction had been wrongfully sued out.

It is contended that the city council did not concur in the proposed settlement at its meeting in the evening of March 23, but defeated the same. At that meeting resolutions in the main like the one which the five aldermen had agreed with complainants to introduce and pass, were presented, and a motion to adopt them

was made and seconded. The mayor ruled the motion out of order. There was an appeal from that decision, and the chair was overruled by a vote of five to one. The yeas and nays were then called upon the motion, and four voted for it and two against it, one of those who signed the agreement to pass these resolutions voting against the motion. The mayor declared the motion lost. This declaration by the mayor was not necessarily conclusive. The yeas and nays were inscribed upon the record. A quorum was present and voting. If a majority of the quorum had statutory authority to adopt these resolutions, then the affirmative vote of four out of the six aldermen present constituted an adoption of the resolution, and the mayor could not defeat that result by declaring the motion lost. There were three of these resolutions.

The first resolution offered is slightly different from that embodied in the agreement. It reads: "That the city council of Morris hereby approves for use in said city, in addition to the other meters heretofore approved, any standard water meter that may be in use and proved satisfactory in various cities." This did not repeal or conflict with the ordinances attacked by the bill. The first ordinance enacted that water consumers were required to use a meter to be hereafter approved by the city, and that the city should within thirty days decide upon a proper meter. The ordinance of August 12 provided that certain meters named, "or any other meter approved by the city council of Morris, with straight reading registers, be adopted as the standard water meter for use in connection with the water department of the city of Morris, or any other make of meter of like principle and equal merit as the Crown and Empire meters, with straight reading dials, to be approved by the city council." The ordinance did not require that the subsequent approval of another meter should be by ordinance, and no reason is perceived why the majority of a quorum present could not adopt this first resolution

approving for use in the city of Morris any standard water meter in use and proved satisfactory in other cities. Whether it would still be subject to the requirement of a "straight reading dial" is not material here. We therefore hold that the first resolution was adopted.

The third resolution gives consumers the privilege of buying meters of dealers or manufacturers direct, if they prefer. The ordinance of August 12, 1907, read: "All meters shall be purchased by the city and sold to the water consumers at cost." As already said, various proceedings of the city council show that it had been the contention of the city that the ordinance compelled consumers to buy their meters of the city. That was one of the chief points of the controversy. On March 10, the city attorney had filed an answer in this case disclaiming that meaning, and asserting that all that was meant by this language was that if consumers bought their meters of the city, the city must sell to them at cost. The third resolution was a ratification by the city council of that interpretation of the ordinance. If the city attorney could bind the city by an answer setting up that meaning, certainly a majority of a quorum could ratify that concession. We hold that the third resolution was adopted.

The second resolution presents a more difficult question. If it was intended thereby to repeal the ordinance that could not be done by resolution nor by four votes. The ordinance of July 8, 1907, repealed all flat rates and required all consumers of water to use water at meter rates as previously established by the revised ordinances, and required meters to be furnished by October 1, 1907. It did not establish a penalty for failure to put in a meter by that date, nor direct that the water should be shut off from those who did not insert a meter by that date, nor did it provide how consumers should be charged for water who failed to put in a meter by that time. When this

resolution was voted upon a new condition had arisen. Almost six months had passed since the date when the ordinance required meters to be installed, and the complainants and apparently many others had not installed meters and yet had used the water continuously. The city had now conceded that they need not buy meters of the city, and that they might install any standard meter which had been used and found satisfactory in other cities, and the complainants had conceded that they would put in meters. But the meters could not instantly be procured and put in place. That would necessarily be a slow work. No ordinance required that the water should be shut off. It was impossible to measure the water those had used since October 1, 1907, who had no meters, nor to ascertain how much they would use before the meters could reasonably be procured and put in place. To meet this emergency the second resolution extended the time for putting in meters to August 1, 1908, and directed that water rates be collected on the former flat rate till that date. We are of opinion that the ordinance of July 7, 1908, did not prevent a majority of a quorum from providing for that contingency which had arisen after the ordinance was adopted, and that the resolution did not repeal the ordinance. It is worthy of note that in the answer defendants set up a resolution alleged to have been adopted by the city council on September 9, 1907, extending the time to December 1, 1907, for putting in meters, and another resolution, alleged to have been adopted on November 25, 1907, authorizing the superintendent of water works to extend the time for putting in meters so long after December 6, 1908, to those who had by that time placed an order for a meter, as would enable them to put in their meters by the use of reasonable diligence. In view of these allegations of its answer, the city can hardly be permitted to deny that the extension provided for by the second resolution of March

23, 1908, could be established by resolution. We conclude that the second resolution was adopted.

It follows that the written arrangement for a settlement, made March 21, 1908, by the fire and water committee and two other aldermen, acting for the city, and by two of the complainants and the solicitor for all the complainants in the bill in this case, was fully carried out on March 23. The fact that the motion for a dissolution of the injunction was set down for 10 A. M., of that day, while the city council would not meet till 7:30 P. M., caused the agreed order to be departed from. Instead of the resolutions being first adopted, and then the injunction being dissolved and the bill dismissed, the bill was (apparently) dismissed early in the day, while the resolutions were adopted in the evening. But the settlement was fully effected during that day. The injunction was therefore dissolved in carrying out a settlement agreed upon between the parties. In such a case, upon the authorities already cited, the complainants are not liable for damages. It is argued that as the mayor and the superintendent of waterworks were defendants, and were enjoined, and did not agree to the settlement, they therefore are entitled to damages. They were made defendants only in their official capacity. They had no private interest in the suit. The injunction would have been equally effective against them in their official capacity if they had not been named as defendants. An injunction against a city binds its officers.

The decree awarding damages is therefore reversed.

*Reversed.*